v. Precinct 15 v. Prasad. Mr. Powell, please come up. Your Honors, may it please the Court. Morning. I'm Michael Holley and I represent Jason Clinard in this appeal. I'd like to reserve three minutes for rebuttal, please. All right. Now, when Jason Clinard killed his bus driver, he was 14 years old. The stakes at his juvenile transfer hearing were going to be very high because his chance of getting a life sentence in adult court were very high. His first lawyer was a very experienced lawyer, had 35 murder trials under his belt, 12 years experience as a district attorney. And in his opinion, Jason Clinard had the best case to avoid transfer that he'd seen in 28 years of practice. The family hired a different lawyer and that lawyer made a serious mistake at the transfer hearing. Partway through the hearing, probably about 80% of the way through the hearing, he waived transfer, agreeing to Jason Clinard's trial in adult court. Now, everyone to look at this case has admitted that that was a mistake, that that was defective performance, deficient under Strickland. So the real question, the only real question is prejudice under Strickland. Is there a reasonable probability that Jason Clinard could have avoided transfer had they fought the issue out? Now, my brief lays out. There are two very strong reasons to think that he could have had at least a reasonable probability of avoiding transfer. One is obviously his extreme youth. He until about 1994, Tennessee had prohibited the transfer of someone so young. That's losing the end of your sentences. 1994, Tennessee what? Until 1994, Tennessee had prohibited the transfer of anyone that young. They changed law in 94, so it was allowed for him. But there's a widespread belief that transferring people so young is not and the ABA guidelines continue to advise against allowing the transfer of someone so young. And I've cited some statistics showing that the transfer of people that age, even for violent crimes, is very, very low. Do you know, do they look at the age at which it was committed or the age at which the transfer takes place? Your Honor, for that question about the juvenile when the offense was committed. Now, it is tied in, age is tied in with the hope of rehabilitation, of course. And so at that point, I suppose you actually look at where the person is today and how old they are. For example, Jason Clinard was 15 by the time he had his transfer hearing, but that still allowed for roughly four full years that the state could try and rehabilitate him before he would be released. And that is the other point. I mean, all the evidence of the transfer hearing, at least all the scientifically sound evidence, pointed in favor of rehabilitation. And another just factual question. At 19, did they get released on their 20th birthday or on their 19th birthday? I am not completely sure, Your Honor. My understanding from reading the record is that they were 19, I believe. But the state may know better on that. What gets us beyond the realm of speculation as to what the judge's ruling would have been had the transfer hearing gone to conclusion? I know the judge said he had not made up his mind at the time the transfer took place, but how are we going to get beyond the realm of speculation as to what might have transpired into the realm of reasonable probability? Sure, yes, Your Honor. And that is the position the court is in in any Strickland or Brady case where you're looking back and saying, is there reasonable probability that the outcome would have been different? And I think what we have here is we know that the judge was not convinced by the crime alone that the juvenile had to be transferred. So that's a big step right there. And at that point, clearly he was weighing rehabilitation. And the only evidence on rehabilitation, the only scientifically sound evidence favored retaining him in juvenile court because he could be rehabilitated for the major depressive disorder that he was diagnosed with. Now, as soon as he was arrested, he was sent to the state facility for the very purpose of diagnosing him and giving an opinion on rehabilitation. That state doctor, Dr. Curry, indicated rehabilitation was likely after diagnosing him with depression. So the state court said, we don't know, and you didn't give us any more information, right? Any more information, Your Honor, on? On what the hearing, what the evidence would have been had the hearing continued. The state court faulted your client for not presenting more testimony to convince the court that he did have a reasonable probability. It did, in part, fault him for that. But then, of course, the court turned and looked at the evidence that was actually in the record, and it had to weigh the evidence there because there already was substantial evidence. And really, the bulk of the evidence was in on rehabilitation being the opinions of Dr. Curry and Dr. Burnett. So what do you do with the trial judge's statement about there being overwhelming evidence and I wanted to see what the defendants would put in? Yes, Your Honor. That juvenile court judge was And, you know, in passing, he mentioned that he hadn't seen evidence yet, for example, on, you know, was the gun loaded or unloaded? How did they board the bus? Now, the reality is, he had heard that testimony when you look back. And the same for rates of recovery or rates of successful treatment. Dr. Burnett had testified that the rate of successful treatment of depression is 80 to 85%. He had heard those numbers, even though six years later, he was kind of thinking, well, I was still waiting to hear some of this testimony. So he had, in fact, heard that testimony. And that's why it really makes sense to go back and look at the record and say, okay, if the parties had forced him to make a decision, is there a reasonable probability, merely reasonable probability, that he would have ruled in Jason Clarno's favor? So if the first lawyer, if the first lawyer had conducted the hearing, what more would have come in? Your Honor, he did testify to what else he would have brought. He said he would have brought more people from the Middle Tennessee Mental Health Institution, which, of course, is the state institution that Dr. Curry is from. I gather he would have brought Dr. Curry. He believed that he makes a better personal witness, I guess, than Dr. Burnett. And there were two other doctors he'd identified. Their names are in the record, Dr. Farouk and I forget the other one. But he had identified two other doctors who would come and talk more about the facilities and so forth. But, you know, I mean, any state is going to have the facilities to treat depression. And that is what Dr. Burnett said. He did testify that the state has a facility where he could be treated. So why weren't they called at this hearing? Your Honor, that was due to the ineffective assistance of counsel, Your Honor. It's because this lawyer was not doing his job properly, unfortunately. Was what? Was not doing his job properly, Your Honor. Which lawyer? Mr. Worth Lovett, who was handling the transfer. Oh, I'm sorry. Are you talking about the post conviction? Your Honor, I'm not sure why. That is something that, you know, those doctors may not have been available still at that time, but I just don't know. So, I mean, it is an unusual situation, but what would the relief be? Your Honor, the relief, there's two possibilities, really. The one that most courts have followed, and this court in White v. Souders followed, is to send it back to the federal district judge to hold a transfer hearing and decide if transfer would have been appropriate. Really, the remedy for a Strickland violation has to be to put the person where they would have been absent of the violation. And that is the remedy that most courts have landed upon. Now, the Supreme Court in Kent mentioned that there is the possibility of a drastic remedy of simply vacating the conviction and dismissing the indictment. In Kent, the because he'd been found not guilty by reason of insanity and some other charges. So the Kent court didn't want to do that in that case. I think that is a possibility, but otherwise it is to send it back to the district court for a juvenile hearing. There is another layer here, though, isn't there, in that this is not the appeal, the state appeal or the post conviction proceeding. You've got to meet the habeas standard, and that makes the hill a little steeper to climb, doesn't it? It does in general, your honor. In this case, I don't believe it does. We've laid out arguments on those points, which the state has completely declined to respond to. One is, just like in the Vasquez case from the Sixth Circuit, it's Vasquez v. Bradshaw, your honor. In both, in our case and in Vasquez, the state appellate court, post conviction appellate court, stated the reasonable probability standard correctly in the beginning, but then when it went to apply it, misdescribed, said the standard was, would the outcome be different? You have to prove it would have been different, and that is a clear error in describing the standard, and in Vasquez, this court said that that error is enough to set the AEDPA difference standards aside. The standard is, there has to be a reasonable probability that the outcome would have been different, is that right? You're right. At this point, I was talking about the AEDPA standard on the extra deference required under AEDPA, and when the state court makes a clear error of law, then the AEDPA deference is set aside. That type of misdescription of the Strickland standard, I'm sorry, your honor. I see where you're going. That description of that Strickland reasonable probability standard, that type of error describing it. There's another argument, I believe in the briefs, that the AEDPA deference wouldn't apply because the state court unreasonably determined the facts by misstating the record. What's your argument on that? Yes, your honor. There's two aspects to that. One is that they misdescribed the rehabilitation. Both mentioned Dr. Curry's report, but then pretended like it was irrelevant by saying, well, Dr. Curry just found he's not committable to a facility, which is a totally different question under a totally different statutory prong. They acknowledge it's in the record, but then they misdescribe it to make it irrelevant, when in fact it was probably the most relevant opinion out there. The other one, your honor, I see I'm out of time, but the one was distorting Dr. Stelford's opinion to make it look like she had somehow, based on an analysis of Jason Clenard's genes, reasonably concluded that he was just destined to be a violent killer for the rest of his life. And what was wrong with her opinion in that regard? Your honor, that was not the genetic theory. The genetic theory was his gene makes him more susceptible to depression because he's not uptaking serotonin properly, which is precisely the kind of thing that medication can treat. So he's subject to depression, but that is treatable. And so she said, separate and apart from depression, that he's not treatable because this is not her exact words, but he has a character flaw or something of that nature. Yes, your honor. She hadn't really tied his untreatableness to the gene. What she had said was, I don't think he can ever be rehabilitated because he has a broken conscience, because he has a broken lighthouse, as she called it. And it wasn't based on a diagnosis or interviewing him or any scientific reason. She never examined him, is that right? She did not, not before the hearing, your honor. She had been hired two months before, yet had never interviewed him. If you look at page 164 of the transcript, I believe it is, she describes how she was hired and what her role was. It looks like it was initially just going to be to review records. Then the day before they called her and asked her to come in and talk about the Miranda issue. And then she came in and gave this apparently off the cuff assertion about, well, he can never be fixed. All right, you have your rebuttal time. How old is he now? I believe he's 26, your honor. It was 12 years ago. What's his status within the institution? I mean, in terms of rehabilitation and compliance with the rules of behavior at the institution and things like that. Do you know anything about that? I don't know much. I know he's in a regular facility. I believe he told me they quit medicating him. I can't remember if it was when he was sent to the prison in a juvenile section, or maybe on his 18th birthday they quit medicating him, but he's in the general population. All right. Thank you. Good morning. May it please the court. Nick Spangler on behalf of the state of Tennessee and the respondent warden. I want to lead off by addressing the standard of review issue. And as the court probably knows, maybe one of the most confounding aspects of 2254 cases is all the sort of layers of review standards that we have in reviewing the state court's determination. And as I understand it, at least as far as the ADEPA standard is concerned, the council's argument is that the state court essentially misstated the Strickland standard for prejudice. And I want to address that in the context of the Vasquez opinion and lead off by saying that first of all, the Vasquez opinion is not a published decision and is therefore not binding on this court. But more importantly, if you study the Vasquez opinion, it's interesting because the court's misstatement of the Strickland prejudice prong in that case infected both the trial court level order, in other words, the post-conviction court level, and the state appellate court level In other words, that restatement occurred in both of those levels of opinions. Here what we have is a trial court level opinion, in other words, the post-conviction court level opinion, which repeatedly correctly stated the Strickland prejudice prong. And then you have a state appellate court opinion that also correctly restated the Strickland prejudice prong. I counted, I think, at least four times. In doing so, it sort of had its boilerplate restatement of the post-conviction court's correct, accurate restatement of the Strickland prejudice prong. And then we have this one rogue misstatement of the Strickland prejudice prong as sort of the court's last concluding statement in the CCA's opinion. We'd suggest that that's totally sort of not on all fours with Vasquez at all. It is sort of one rogue misstatement, and it's sort of couched or insulated by multiple correct restatements of that prejudice prong. So in we'd submit that the ordinary 2254 standard review applies, that that does not amount to an unreasonable application of federal law insofar as the Strickland prejudice prong is concerned. And so we're sort of outside of this. You know, in Vasquez, I think Judge Boggs said something about, or said, made statements to the effect that the court, the problem he found was that the court applied law contrary to the Supreme Court by holding that the absence of exculpatory witnesses does not demonstrate that counsel was ineffective and that the outcome of the trial would have been different had they been witnesses. And in our case, they're witnesses that were not presented. So who arguably, at least your opposing counsel makes the argument, would have made a difference in the outcome of the hearing, the transfer hearing. Doesn't Vasquez give us some guidance in that regard based upon the statements in that opinion? And candidly, I'm not super familiar with Vasquez in terms of the factual proof that was put on in support of the Strickland claim in that case. I was more focused on the standard review that was applied and the improper restatement of the prejudice prong. But I know that the main problem with this case, insofar as the proof is concerned, is this total absence of proof during the post juvenile transfer hearing, it would have made a difference. We just don't have that proof. But we do have the record of, we do have the first lawyer and we do have, did he testify? He did testify. Initially appointed counsel testified. Right. And he also talked about the other witnesses that he had lined up and the strength of the case. I mean, it's just opinion, but he did have people lined up and he did have the judge. I guess I'm not sure what more, I mean, it's not a but-for standard. And when you have a judge who says, I hadn't decided yet, and then there's more that could have been, I mean, it almost seems like you're making the defendant prove that the outcome would have been different as opposed to that, you know, there was a reasonable probability given that the judge hadn't decided yet. It certainly is the petitioner's burden to prove a reasonable probability that the outcome would And yes, Your Honor, there certainly was proof that was put on during the post-conviction hearing. The problem is, is that proof didn't take the form of those witnesses. And interestingly, the proof that was put on about counsel testifying about the witnesses that he had lined up, actually was, it was the proof that actual transfer hearing counsel did put on. It was Dr. Burnett. It was some additional witnesses from care providers that weren't put on during the transfer hearing, but there weren't very many specifics discussed about what those people would have testified to. You know, there was going to be testimony he suggested that they would have been treatable at these facilities, but that's no different than what Dr. Burnett actually testified about during the transfer hearing. And that leads to another point that the state wants to make about this, and that is sort of this misperception that the juvenile court judge did not make a determination here. To be clear, the juvenile court signed a written transfer order that made factual findings and legal findings that were based upon the record that had been developed during the transfer hearing up to that point. It certainly referenced this agreement that counsel had made, or this, you know, this waiver of the transfer. It acknowledged that counsel said, we agree to this transfer. But notwithstanding, the juvenile court judge testified at the post-conviction hearing that he would not have signed that order but for sufficient evidence to support those requisite findings. And interestingly, the transfer statute in Tennessee makes that mandatory. It says, you know, it doesn't say regardless of transfer, but it says the court's bound to make these findings based on the evidence. And you can sort of read that to be interpreted as regardless of any agreement of counsel. But didn't the judge say that he was surprised that the party stipulated to transfer at the point that it did, which was the point at which the judge was waiting for and anticipating additional evidence? He did, Your Honor. And what we argue is that there's sort of a space between the point at which this in-chambers meeting happens, where he's surprised that counsel's coming up and saying, we agree to this transfer. When he says that he hadn't made a decision up to that point, that's reasonable because he's not been called upon to make a decision. But after counsel says, I'm agreeing to this transfer, and the court goes back in chambers and is bound to follow the statute that requires him to make a transfer determination based on the evidence and based on the statutory factors involved, he has to go back there and apply that evidence to the law and make those requisite findings. So that's what we argue, is that there's sort of the space. Yes, he hadn't made that determination at the point this in-chambers meeting happened, but at the point at which he was obliged to sign this transfer order or make these findings, he had made up his mind. And again, he did testify at the post-conviction hearing that he would not have signed that order but for the evidence to support the requisite findings. So then the question becomes, what more would have Budden put on had they continued? Exactly. And would that have tipped the scales back? Exactly, Your Honor. And as far as that's concerned, we have really a complete devoid of any proof. Why isn't there ineffective assistance of post? That may well be the case, but the problem is the only reason that ineffective assistance of post-conviction counsel may play a role here is if the underlying ineffective assistance of transfer counsel claim were defaulted in some way. And even actually under the Atkins opinion from this Court, the published opinion from a few years ago, and I'm familiar with this because it was the case that I handled, says that even the Martinez excusing the default because of ineffective assistance of post-conviction counsel does not apply to ineffective assistance of transfer counsel, juvenile transfer counsel claims. So it may be that post-conviction counsel is ineffective, but that simply doesn't play any role in the calculus of this Court's decision about the exhausted ineffective assistance of transfer counsel claim in this case. Let me ask you this. The second lawyer at the transfer hearing who was allegedly ineffective, is that the same lawyer that represented the petitioner at the subsequent post-conviction proceeding? And I'm sorry, are you asking whether the lawyer who did the transfer proceeding was the same lawyer that did the post-conviction proceeding? Yes, the second lawyer. That was a different lawyer. Okay. We had initially appointed counsel who was the public defender, another retained counsel who handled the transfer proceedings and agreed to the transfer, and then a later, I'm not sure if they were appointed or retained, probably appointed counsel who handled the post-conviction proceedings. But given that we do have this transfer order with all these findings based on the evidence that was developed during the transfer hearing, the petitioner was obliged to present evidence at the post-conviction hearing to establish a reasonable probability of a different outcome by the juvenile transfer judge, but for counsel's sort of agreement to waive that contest. Just to understand your position, is it your position that counsel at the transfer hearing did not commit ineffective assistance of counsel by stopping the hearing and agreeing to waive? Or is it your position that that was ineffective? What's your actual position on that? Certainly our position is that that did not result in ineffectiveness, mainly because it didn't result in prejudice, and that's what the state appellate court found. We actually contested the deficiency prong. Strictly in ineffective assistance claims, it's deficiency and prejudice. We contested both deficiency and prejudice in the state court, and both the state post-conviction court and appellate court disagreed with us as to the deficiency prong. Standing up here today, we'd submit that we still take issue with the finding of deficiency because again, without calling counsel, we have this presumption that operates in Strickland that says, without counsel being called or asked about his alleged deficiency, there's a presumption that any action or inaction is supported by a strategic decision-making. That language is in Strickland itself. And so without calling counsel to confront him about these alleged deficiencies, we're left with a record that's completely devoid about why... It's something in the record that the explanation is that this guardian ad litem thought that he would do better if he agreed to be waived. But the problem is that they don't have any insight as to actual counsel's specific decision-making process. And I'll just submit sort of a hypothetical here, and one that I noticed in the record that wasn't fleshed out because counsel wasn't called. And that is that ultimately, and opposing counsel acknowledges, ultimately petitioner here was not sentenced to life without the possibility of parole, which was an option that was on the table. He was ultimately sentenced to life with the possibility of parole because the state agreed to that. Juvenile transfer hearing... It wasn't after 50 years or something like that. It was, but it was a concession that's evident in the record that may have been the basis for this agreement for counsel to waive the transfer. The problem is we never had counsel to get up there and testify about that. And even the juvenile court judge acknowledged that there may have been additional reasons or some reasons that counsel waived this transfer hearing. He just couldn't recall. And even opposing counsel acknowledges that his memory of this was a little bit wishy-washy. On one hand, he says, oh, I didn't make a decision, yet we have a signed written order that he did make a decision, and then he wouldn't have signed that order but for proof to support that. So there is something in the record that could suggest strategic action on counsel's part. We're not contesting that in these proceedings, again, because we're sort of stuck with the state court's determination that there was deficiency. So we're here today to defend solely on the prejudice prong. But that is out there, that without calling counsel, that doesn't just weigh on the deficiency prong. It can also weigh on the prejudice prong because had counsel got up there and said, I waived this because the state was going to agree to life with the possibility of parole, that would weigh on the prejudice prong. But again, petitioner simply didn't call transfer hearing counsel. I guess what leaves me feeling uneasy is, and I had some of these hearings, which I found extremely difficult. You have a situation where the kid's 14, terrible crime, and there's testimony that he can be rehabilitated. And in a situation like that, I mean, it's so discretionary. I mean, there are guidelines, but it's so discretionary, and you know that going in. And it's really just a matter of what that judge on that day gleans from the testimony in a case like this, where there is real testimony about rehabilitation. And you can talk about a reasonable probability, and the state court said there wasn't one. But I don't know how you argue that there wasn't one if you have a judge who was engaged with the testimony and wasn't ruling it out. The problem that this court faces, though, is the question that this court is bound to answer is whether there's record support to support the state court's determination. And yes, there's some testimony from the defendant's side that he could have been rehabilitated. The problem is there's also testimony from the state's side that he could not be rehabilitated and that he could not be treated. But you mean the testimony by Dr. Stolfart to that effect, who really did not examine him at all and really didn't meet him prior to giving her testimony? That's true. But there's also unfavorable testimony from the defense experts as well in terms of the defendant's history of violence and the history of anger problems and the way that manifested itself in violence. So there's not sort of a complete devoid of record support for the state court's determination that the juvenile court made the right call as far as the interest of the community and the need to have this person incarcerated. But is that the question, whether it was the right call? Is that the question for this court? No, that's... Is that what they decided, that the juvenile judge made the right call? No, what they decided was that the petitioner had failed to prove a reasonable probability of a different outcome in the transfer judge's decision but for counsel's agreement to that contest. So in effect... In this court... I'm sorry, go ahead. They're saying that the judge may have said that he hadn't decided but we know what he would have decided. No, I think that the transfer judge here did make a decision and that's reflected in his written order which reflects the agreement of counsel but also reflects the evidence that was submitted at the transfer hearing up to that point. And you compare that evidence, which there's certainly record support to support the evidence that was submitted during the post-conviction proceedings, which is essentially the hearsay testimony of previously appointed counsel who didn't even represent the petitioner in the context of these transfer proceedings sort of speculating or reflecting or recounting about witnesses that he would have called to testify and not even being specific about what that testimony would have been and otherwise largely being cumulative to what transfer counsel actually put on during the hearing. And that's all we have in the post-conviction hearing to sort of confront the transfer judge's decision. And in light of that, we'd submit that the state court reasonably concluded that the petitioner failed to prove a reasonable probability of a different outcome about their counsel's agreement. I just have a question. If the judge initially had denied the request to transfer, what actually would have happened to this young man at that point? Probably what would have happened, there would have been an adjudication of delinquency, at which point the juvenile court would have retained jurisdiction over that juvenile until the age of 19, and any number of measures could have been taken, such as incarceration treatment at a custody facility for juveniles. Once the juvenile court would have jurisdiction if the transfer wasn't made, that didn't automatically mean that he would be confined at all, correct? It would be their discretion. Exactly, Your Honor. It's sort of like sentencing after a conviction. There's a delinquency adjudication and then a... At age 19, the juvenile court would have lost jurisdiction? That is correct, Your Honor. And so then he would be totally unsupervised. Totally unsupervised. And that was the court's concern as to whether or not there had been proof establishing that either keeping this juvenile out of custody or even just keeping him in custody until age 19 would keep the community safe given the violent actions involved. And, you know, we sort of get lost in these habeas cases to get away from the facts. But again, this is a situation where the bus driver got onto this petitioner for chewing tobacco on the bus for dipping. He got mad about it, brought a gun and shot her multiple times, at which point the bus still in drive flew down the road and almost impacted like a telephone pole or tree, and another student had to intervene by going and hitting the brakes. So the juvenile court was certainly and justifiably concerned. And even initially appointed counsel acknowledged he said, I had all this proof, but to be honest, I thought it was unlikely the transfer was going to be denied. Of course, treatment and counseling would be different in a juvenile system than simply sending him to prison. Certainly, Your Honor. All right. Unless the court has further questions. Thank you for your time. Is it correct that in Tennessee, when you get life with parole, you get considered after 51 years or something? Life with parole, I believe that's correct. I think it's about 50. Technically, it's like a 60-year sentence, but the way that credits work and all that sort of stuff, I think it ends up being a 51-year sentence, Your Honor. Unless the court has further questions, we respectfully ask that you affirm the decision of the district court. Thank you. Thank you. Your Honor, the government just admitted that it was already in the record. Already what? The testimony about rehabilitation was already in the record. That was already in the record through Dr. Burnett and, of course, through Dr. Curry's report. The extra evidence, the other doctors would have been kind of like icing on the cake. What was really lost here was the opportunity to make the judge make up his mind, to make the decision based on the evidence that was there, and they passed up the right to argue it, to present it in a persuasive manner, in an organized manner, and try and get the best ruling they could. That's what was really lost here. The judge did testify. His last word on the issue was that I did not make the decision. That's what he said. Perhaps he felt he could sign the order because it wasn't beyond the pale to approve their agreement, but he said he did not make the decision. That was his final testimony on it. And in my reply brief, I cited a Tennessee Supreme Court case that says, Smith v. UHS, that says just because the judge signs an agreed order, you can't assume that he made all the findings in it, if there's any reason to cast doubt on that fact. I mean, that's the case here. I mean, the judge himself has testified that he did not make those findings himself. So it is right to look, when looking at the reasonable probability, to look at the record evidence and then imagine it presented by a capable lawyer pushing for a favorable outcome for his client. And I think it's, you know, the reasonable probability standard is kind of mushy. And it doesn't mean you're more likely than not to win. It means that there's a chance. And the fact that the judge was still open to it after hearing about the crime and so forth really goes a long ways to proving that. You mentioned in response to a question that one relief, one method of relief would be that it would go back to the court and the court would, in effect, reconduct the transfer hearing. Am I stating what you said correctly? Yes, Your Honor. And this question, you may not know the answer to, and I certainly don't. But would the defendant's current mental state be relevant in that hearing? Or does the judge have to go back in time because he's reviewing the correctness of a state court decision at a fixed point in time? Your Honor, I would guess that you would look back at that point in time. Although I suspect that we would probably try and bring in proof showing how things have really turned out. Your Honor, I'm not sure about that. You're supposed to give him the hearing that he would have had otherwise. At that time, of course, they wouldn't know what had happened in the ensuing 12 years. And, you know, at that hearing, then Mr. Klinower . . . Of course, the subsequent behavior of the petitioner might shed light on the predictions by the experts at the time of the transfer hearing. It might, Your Honor. I could imagine it being relevant, and I haven't thought through that fully. But if granted a hearing in the district court, I'm sure all those issues would be hammered out, including perhaps the constitutionality of transferring someone that age. But I see my time is up. Are there any other questions? No, apparently not. Thank you for your arguments on both sides. The case was well argued. And the case is submitted.